

# NEUROPSYCHOLOGICAL
— S C I E N C E S —

**February 24, 2020**

The Honorable James R. Klindt
United States Magistrate Judge
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202-4270

      RE:   United States of America v. Romeo Xavier Langhorne
              Case No. 3:19-cr-218-J-20JRK

Dear Judge Klindt:

Per your request for a Competency to Proceed Examination pursuant to Title 18, USC § 4241 and 4247, I evaluated Mr. Romeo Langhorne (DOB: ▮▮▮▮▮▮; 30 y.o. male) on 02/13/20 at the Baker County Jail in Macclenny, Florida. Mr. Langhorne's attorney (Mr. Charles Lammers) also attended the evaluation.

In preparing this report, I reviewed the following materials and conducted the following procedures:

    1.) Indictment.
    2.) Competency to Stand Trial Order by The Honorable James Klindt dated 02/03/20.
    3.) Face-to-Face Interview with Mr. Langhorne on 02/13/20.
    4.) Psychological Testing of Mr. Langhorne which consisted of the following:
        a. Structured Competency to Stand Trial (CST) Interview.

## I.   CURRENT CHARGES / LEGAL STATUS

Based on the indictment provided by the U.S. Attorney's Office, Mr. Langhorne has been charged with one count of providing material support to a foreign terrorist organization.

## II.   FINDINGS OF CURRENT EVALUATION

*It is my opinion, with a reasonable degree of psychological certainty, that Mr. Langhorne has an adequate understanding of the nature and consequences of the proceedings against him and that he is presently capable of properly assisting in his defense.*

CONFIDENTIAL FORENSIC PSYCHOLOGICAL EVALUATION
Langhorne, Romeo X.

## III. NOTIFICATION / CONSENT

At the beginning of the evaluation, notification was made to Mr. Langhorne about the nature, purpose and non-confidential aspects of the current evaluation. He was informed that a report would be written and shared with defense counsel (Mr. Lammers), the U.S. Attorney's Office (AUSA Ms. Taylor), and the court (Judge Klindt). Mr. Langhorne was informed that the report would not be confidential and that this examiner may be called to testify at a hearing. Finally, he was advised that a doctor-patient relationship did not exist in the context of the current evaluation. Mr. Langhorne indicated that he understood the limits of confidentiality and agreed to continue with the examination.

## IV. FACE-TO-FACE INTERVIEW WITH MR. LANGHORNE ON 02/13/20.

*Birth, Developmental and Childhood History:* Mr. Langhorne reported that he was born to his biological mother on 07/12/1989 in Roanoke, Virginia. When asked if he was born to both his biological mother and father, he stated, "I'm a bastard" and that he did not know his father. When asked if his mother experienced problems with her pregnancy or birth of him, he stated, "Pulled out of the womb, if you must know - C-Section." Mr. Langhorne was the oldest of four children born to his biological mother and said, "I'm the breaker - The breaker of the womb." He said he did not know if he was slow or fast with regard to the acquisition of his developmental milestones. He was raised in Virginia and when asked who raised him, he said, "I am a bastard – just my mother." When asked about any history of emotional or physical abuse, he stated, "Perhaps emotional" while denying a physical abuse history.

*Educational and Occupational History:* Mr. Langhorne said he took regular classes in school until the 4th grade at which time he was transferred to "Special Ed." He reported that he had "disruptive behavior – later on it's emotionally disturbed and ODD and all that other BS." "I got meds for a while - on Ritalin…" He said he was diagnosed with Attention Deficit Disorder by "Dr. Taylor" in Virginia. He claimed to have seen Dr. Frazier (psychologist) as a child, too. He graduated from Franklin County High School in Franklin County, Virginia in 2007/2008 with an estimated his GPA of 2.0-2.5. He was interested in ROTC, reading, and social studies in high school.

In 2008 and 2009, Mr. Langhorne attended El Paso Community College in El Paso, Texas where he attended classes for three semesters after moving there to follow a girl with whom he was in a relationship. He said he performed "fuckin' phenomenal" in his classes at EPCC. While in El Paso, Mr. Langhorne worked at Taco Bell. He has worked in fast food, homemade kitchens, experimental gastronomy restaurant. He started out as a fry cook, prep cook, line cook, salad guy. He last worked Cabo Taco in Roanoke, Virginia in 2019 as a line and prep cook. He worked at various fast food restaurants for "short" and "long" periods of time. He said he stopped working because he was disabled and was unable to receive pay for work because he could not exceed a certain amount of income. He said he received SS Disability benefits since he was approximately seven years-old due to mental reasons. He also said he has a past diagnosis of "Depression, Oppositional Defiant Disorder (ODD), and Antisocial Personality Disorder - "At St. Augustine - The Drop-in Center." He also reported having been diagnosed with Paranoid Schizophrenia in 2015 by "some asshole at Piedmont Community Services in Rocky Mountain, Virginia," and Schizoaffective Disorder.

CONFIDENTIAL FORENSIC PSYCHOLOGICAL EVALUATION
Langhorne, Romeo X.

*Medical/Psychological, Relational and Legal History:* Mr. Langhorne denied any history of chronic medical conditions or acquired neurological diseases such as stroke, seizure, concussions or brain tumor. He is presently prescribed folic acid and Metoprolol.

Mr. Langhorne reported that he has voluntarily hospitalized himself in an inpatient psychiatric facility 5-10 times in Virginia when he had "The big sads, ya know?" He attributed his admission to severe depression. He denied experiencing current suicidal thoughts at the present time and stated, "No man, I'm pretty awesome. I wouldn't want to hurt me. I'm the coolest guy I know." He denied having ever been involuntarily hospitalized in a psychiatric hospital. He also denied any history of suicide attempts or self-injurious behaviors.

Mr. Langhorne has never been married and has no children. He said he was unsure if he was in a relationship at the present time. He reported having a good relationship with his mother.

Functionally, Mr. Langhorne was living by himself in a room in a house and "I took care of myself the best I could." He was managing his medications and his finances to the best of his ability and was living off his disability payment from Social Security Disability.

## V. BEHAVIORAL OBSERVATIONS AND MENTAL STATUS EXAMINATION OF MR. LANGHORNE.

Mr. Langhorne arrived dressed in typical jail attire. Rapport was adequately established and maintained although Mr. Langhorne was noted be mildly emotionally reactive. He was tangential but was able to be redirected. He reported his mood as, "Complex - a combination of different emotions that fluctuate in time." Affect was reactive. He said he sleeps during the day but is not sure how many hours of sleep he gets each day. He denied nightmares. He reported his appetite as "horrible." He denied auditory and visual hallucinations. He denied suicidal or homicidal ideation.

## VI. EVALUATION OF COMPETENCY TO STAND TRIAL:

It is this examiner's opinion, with a reasonable degree of psychological certainty, that **Mr. Langhorne has an adequate understanding of the nature and consequences of the proceedings against him**. The following evidence supports this opinion:

1. **Appreciation of the charges or allegations against the defendant:** Mr. Langhorne demonstrated an **adequate** understanding and appreciation of the charges and allegations against him. He reported his charge as "Conspiracy to provide material support to a foreign terrorist organization." He took issue with ISIS being referred to as a foreign terrorist organization and said, "This is all bullshit." He understood that he is charged with a felony and when asked if the charge was serious, he said, "In my innocence I say no, but legally, yes." *Mr. Langhorne appears to have an adequate understanding of the charges or allegations against him.*

2. **Appreciation of the range and nature of possible penalties which may be imposed in the proceedings against the defendant:** When asked about possible penalties that may be imposed, Mr. Langhorne said, "I assume both [imprisonment and probation], or a fine. As far as I was told." "They said some shit about up to 20 years and potential life probation. I don't know how that

CONFIDENTIAL FORENSIC PSYCHOLOGICAL EVALUATION
Langhorne, Romeo X.

makes any God damn sense. *Mr. Langhorne appears to have an **adequate** appreciation of the possible penalties for the charges.*

3. Understanding of the adversarial nature of the legal process: *Mr. Langhorne appears to have an **adequate** understanding of the adversarial nature of the legal system and the role of the participants.* He described the following characteristics of the **judge** ("I've only seen the magistrate, not the judge. I guess he hears motions – I don't know what he does. He sits up there like a judge. He judges the verdict, the accused, he discerns the means ...he makes a judgment ...he uses the legal evidence to make an accurate decision. I'm quite sure he is the same as you – ambivalent. He's neutral;" **jury** ("They simply hear the case and make their verdict based on the evidence that is presented for and against the accused. Proof has to be beyond a reasonable doubt. It the jury is all white, I'm sure I will be found guilty." Mr. Langhorne explained the role of **witnesses** was to "give testimony." He knew witnessed could be presented for or against him. He described **Evidence** as "The proof for or against the accused, based in factual reality." He said the role of the **prosecutor** was "Laura Taylor – the prosecutor. She's the prosecutor so she's quite possibly against me. Do I think there is any malevolence against me? It's possible. Make the accused look as guilty as possible...and to prosecute to the fullest extent in which they are capable." He was asked if he thought there was a conspiracy against him and he said, *"I don't think the U.S. is against me. I am a citizen so it is not true the U.S. is against me. It is possible but I doubt – I have no reason to feel there is a greater conspiracy against me."* He knew he was the **defendant** in his legal case and that the role of **defense counsel** was to "defend the accused. He said his attorney "seems quite favorable to me and is for me...perhaps we could be friends."

4. Appreciation of the range of plea options: Mr. Langhorne showed an understanding of basic court-related terms such as guilty ("They had, to the fullest capacity, have committed the crime."), not guilty ("The person is innocent of the accusation.) Plea bargaining was explained and Mr. Langhorne was able to understand plea bargaining. *Mr. Langhorne appears to have an **adequate** appreciation of the range of plea options.*

It is this examiner's opinion, with a reasonable degree of psychological certainty, that **Mr. Langhorne has an adequate ability to assist properly in his defense**. The following evidence supports this opinion:

1. Capacity to disclose to his attorney facts pertinent to the proceedings at issue: Mr. Lemmers was described favorably by Mr. Langhorne. He said he expects his attorney to thoroughly utilize every means he can to be for me and exhibit loyalty and do his best to obtain proof of my innocence – ya know – just to legally defend me. I wish he 'd visit more often it's lonely here. He visited me last week but the days are slow and – I don't know, I think I just bitch a lot." He denied disagreements with his attorney. *Overall, Mr. Langhorne appears to have an **adequate** capacity to disclose to his attorney facts pertinent to the proceedings.*

2. Capacity to testify relevantly and coherently: Mr. Langhorne presented as odd, eccentric, tangential, mildly emotionally reactive, and narcissistic; however, despite these symptoms, he was able to meaningfully participate in a rather lengthy competency evaluation. *Mr. Langhorne appears to have an **adequate** capacity to testify relevantly and coherently at the present time.*

CONFIDENTIAL FORENSIC PSYCHOLOGICAL EVALUATION
Langhorne, Romeo X.

3. <u>Ability to manifest appropriate courtroom behavior:</u> *Mr. Langhorne* denied behavioral problems in the courtroom and said, "I do my best to restrain myself." "I have come very close – the entirety of this. This magistrate has been perfectly fair to me." He understood he was not permitted to yell or act out in the courtroom and he could raise concerns through is attorney. He manifested appropriate conduct with this examiner and thus, he *appears to have an adequate ability to manifest appropriate courtroom behavior.*

## VII.  SUMMARY AND OPINION

Mr. Romeo Langhorne underwent a Competency to Proceed Evaluation on 02/13/20 at the Baker County Jail in Macclenny, Florida.

Although mental health records were requested in this matter, no formal records were available at the time of this report. By report, Mr. Langhorne has a history of mental illness and he is not presently taking prescribed psychotropic medication. This is reportedly due to Mr. Langhorne having been successfully treated with Abilify (injectables) prior to his incarceration and the Baker County Jail not having this medication as a treatment option for patients. They have prescribed a different anti-psychotic medication (Risperdal) but Mr. Langhorne had a "bad reaction" to it and has opted to wait until Abilify is received by the jail and prescribed to him, according to him.

Presently, Mr. Langhorne presents as odd, eccentric, tangential, mildly emotionally reactive, and narcissistic; however, despite these symptoms, he does not appear to manifest symptoms that would form the basis for a recommendation that he be found incompetent to proceed with the adjudicative process.

*It is my opinion, with a reasonable degree of psychological certainty, that Mr. Langhorne has an adequate understanding of the nature and consequences of the proceedings against him and that he is presently capable of properly assisting in his defense. Although I recommend that Mr. Langhorne be found competent at the present time, his mental status should be monitored as it is possible that he could psychologically decompensate without proper treatment and his competency to proceed may become compromised in the future.*

*Please note that all opinions are given with a reasonable degree of psychological certainty and are subject to change should new information become available.*

*[signature]*

Jason A. Demery, PhD, ABPP-CN
Licensed Psychologist
Board Certified in Clinical Neuropsychology
Florida License PY-7500