FILED IN OPEN COURT

5/13/2021

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 3:19-cr-218-J-20JRK

ROMEO XAVIER LANGHORNE

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Maria Chapa Lopez, United States Attorney for the Middle District of Florida, and the defendant, ROMEO XAVIER LANGHORNE, and the attorney for the defendant, John Leombruno, mutually agree as follows:

**A.**  **Particularized Terms**

1.  Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Indictment.  Count One charges the defendant with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).

2.  Maximum Penalties

Count One carries a maximum term of imprisonment of twenty years, a fine of not more than $250,000, or both imprisonment and a fine, a term of supervised release of any term of years or life, and a mandatory special assessment of $100, said special assessment to be due on the date of sentencing.  A violation of the

Defendant's Initials ____                                    AF Approval ____

terms and conditions of supervised release carries a maximum sentence of not more than two years of imprisonment as well as the possibility of an additional term of supervised release.

3. Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First: The defendant knowingly attempted to provide material support or resources to ISIS, a designated foreign terrorist organization; and

Second: The defendant did so knowing that the organization was a designated foreign terrorist organization, or that the organization had engaged in or was engaging in terrorist activity or terrorism.

4. No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States

Defendant's Initials _____                2

will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

6.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(G), and 28 U.S.C. § 2461(c),

Defendant's Initials _____                3

whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any

Defendant's Initials _____        4

documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of

Defendant's Initials _RL_                    5

responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.**     **Standard Terms and Conditions**

1.     Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)),

Defendant's Initials  ʀ̶ʟ̶                       6

including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the

Defendant's Initials _____                    7

countto which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. <u>Financial Disclosures</u>

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the

Defendant's Initials _____        8

purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

      6.    <u>Sentencing Recommendations</u>

      It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

Defendant's Initials _R L_         9

7.  <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.  <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials ____                    10

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant

Defendant's Initials _____                    11

further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____           12

13.   Certification

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this 22nd day of February 2020.

MARIA CHAPA LOPEZ
United States Attorney

ROMEO XAVIER LANGHORNE
Defendant

LAURA COFER TAYLOR
Assistant United States Attorney

JOHN LEOMBRUNO
Attorney for Defendant

FRANK TALBOT
Assistant United States Attorney
Chief, Jacksonville Division

CHERIE L. KRIGSMAN
Assistant United States Attorney
Chief, National Security and
Cybercrime Section

D. ANDREW SIGLER
Trial Attorney, Counterterrorism
Section
Department of Justice National
Security Division

Defendant's Initials _____                    13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:19-cr-218-J-20JRK

ROMEO XAVIER LANGHORNE

**PERSONALIZATION OF ELEMENTS**

**As to Count One**:

1.      Beginning no later than December of 2018, through on or about November 15, 2019, in St. Johns County, within the Middle District of Florida, and elsewhere, did you knowingly attempt to provide material support and resources to a designated foreign terrorist organization, that is, the Islamic State of Iraq and al-Sham, referred to as "ISIS"?  Specifically, did you attempt to do so through the creation and distribution of an instructional video intended to teach followers of ISIS how to obtain materials for explosives without arousing suspicion and combine those materials to make an explosive sufficient to destroy specific types of targets?

2.      Did you do so knowing that ISIS was a designated foreign terrorist organization, had engaged in terrorism, and was engaging in terrorism?

3.      Did you engage in conduct that constituted a substantial step toward the commission of the crime and that strongly corroborated your criminal intent, specifically, by uploading the instructional video to a publicly viewable site on the World Wide Web, that is, BitChute?

Defendant's Initials _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 3:19-cr-218-J-20JRK

ROMEO XAVIER LANGHORNE

**FACTUAL BASIS**

On May 15, 2014, the Secretary of State for the United States designated the

Islamic State of Iraq and al-Sham ("ISIS") as a Foreign Terrorist Organization under

Section 219 of the Immigration and Nationality Act; ISIS remains a designated

Foreign Terrorist Organization.

At some time in 2014, Romeo Xavier LANGHORNE pledged his allegiance

to ISIS. LANGHORNE was aware that ISIS was a designated Foreign Terrorist

Organization and engaged in acts of terrorism. In 2016, LANGHORNE relocated to

St. Johns County, Florida, within the Middle District of Florida, where he resided

until moving to Roanoke, Virginia in April 2019.

During 2018 and 2019, LANGHORNE expressed his continued support for

ISIS through postings on his social media accounts, including the Twitter accounts

@YoRHaJihadi, @Yorha17E, and @YoRHaJihadi17E, his Facebook accounts, and

his Google/YouTube account. During 2018 and 2019, LANGHORNE uploaded

multiple ISIS-produced or otherwise terrorism-related videos to his YouTube

Defendant's Initials _RL_

account, which used the moniker "Takbir Jihadi." During 2018 and 2019, LANGHORNE also participated in multiple online chat rooms hosted on a secure messaging platform in which he discussed his support for ISIS with like-minded individuals.

In December 2018 and January 2019, LANGHORNE expressed in one of these chat rooms an interest in creating a video that would improve on existing videos demonstrating the making and use of triacetone triperoxide ("TATP"). TATP is an explosive material that can be made using readily available ingredients and has been used in multiple terrorist attacks.

On February 14, 2019, LANGHORNE and a person who had been described to LANGHORNE as being member of ISIS, but who was actually an undercover special agent ("UCE") working with the Federal Bureau of Investigation ("FBI"), began exchanging messages through the secure messaging platform. During his initial discussions with the UCE, LANGHORNE expressed an interest in creating videos to post on YouTube for particular target audiences, including "better videos on how and why jihad is needed."

On February 17, 2019, LANGHORNE engaged in further discussion with the UCE via the secure messaging platform. In these messages, LANGHORNE said that he wanted to produce two videos, including "first and foremost an explosive video." LANGHORNE instructed the UCE that the video needed to say that "it's for scientific purposes only and not to be used in any crimes" in order to avoid

Defendant's Initials _____                    16

attracting the attention of law enforcement.  LANGHORNE stated "[n]ow the

creation of such a video and sending it KNOWING It'll be used for crime in

anyway, of course is illegal . . . ."  LANGHORNE specified that the video would

need to "show proper yield to explosive equipment gained" including "example, X

amount will destroy a car, x amount 1 story building, x amount 2 story if place

properly, and X amount for a 3 story building."  LANGHORNE also specified that

the video needed to show "how to obtain the catalyst needed" and that, as a possible

cover story for purchasing the ingredients for TATP, a person could "claim to be a

science teacher there and pay for said equipment with an old burner Visa card."

On February 21, 2019, LANGHORNE called the Jacksonville office of the

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  On February 22,

2019, an ATF special agent returned LANGHORNE's call.  During the phone call,

LANGHORNE asked the special agent how to get an explosive license, whether

someone who was on a terrorist watch could obtain such a license, and what

background checks were conducted on someone who was trying to become an ATF

agent.

The FBI created a minute-long video clip based on LANGHORNE's

instructions to the UCE ("TATP Video 1").  TATP Video 1 began with a disclaimer

stating that the video was being made for scientific and educational purposes.  It then

introduced the topic "TATP Triacetone Triperoxide" along with the following topics

that would be covered: "What You'll Need and Where and How to Purchase, TATP

Defendant's Initials                    17

Production Step by Step and Safety, and Volume and Yield." TATP Video 1 then ended with the statement "More To Come." On April 3, 2019, the UCE transmitted TATP Video 1 to LANGHORNE using the secure messaging platform. After receiving TATP Video 1, LANGHORNE responded "Perfect. This should be able to be uploaded to YouTube legally as well." LANGHORNE noted that "[b]ecause it isn't inherently used for crimes it should pass off fine." LANGHORNE then provided further instructions for what he would like to see in the next version of the video.

On May 12, 2019, the UCE transmitted to LANGHORNE a second version of the TATP video ("TATP Video 2"), which had been expanded to contain additional information LANGHORNE had asked to be included. After receiving TATP Video 2, LANGHORNE responded "Perfect thus far. The volume & yield specifically has a ratio of good importance. The tips for safety are also outstanding. As those are the most realistic ways to purchase items required, avoid digit[a]l tripwires and maintain a low profile." LANGHORNE also described several disguises that could be suggested in the final video and the need for safety apparel when creating TATP. He also speculated about ways to increase the yield of TATP by making improvements to the process for creating TATP and suggested various ways of explaining away evidence of criminal intent. LANGHORNE then stated, "This initial video is basically how to safely create and use TATP without setting off any federal alarms. Its purpose is not to harm but simply to educate." He continued:

Defendant's Initials                    18

> A follow up video on high value targets, understanding contemporary warfare in compar[is]on to classical Islamic warfare, how to scout locations & people, mental & religious preparation, use of disguises, basic legal information required to appropriately scout without being detected or raising alarm. When to strike and how, As well as tactical analysis of active shooting scenarios, law enforcement response & how to successfully leave an area without being caught, are all things for a separate video. One video being the primer, while the second being the catalyst or detonator.

LANGHORNE opined that if the final video were published in the public domain "the Islamic world will have a better grasp on how to defend itself with the usage of explosives in a reasonable & safe manner" and that "everyone who sees, uploads, reuploads & shares this video will be aware of how to safely and accurately create & use explosives." LANGHORNE further opined that this would mean that "the list of potentially dangerous people escalate from being small and well managed to being completely useless as everyone becomes a tier 1 threat."

On May 26, 2019, LANGHORNE uploaded multiple ISIS- and jihad-related videos to his YouTube account as a test to determine whether the videos would be allowed to remain on YouTube. LANGHORNE's YouTube account was suspended the same day.

On June 24, 2019, the UCE provided LANGHORNE with a third version of the TATP video ("TATP Video 3"), which included additional information that LANGHORNE had requested. After receiving TATP Video 3, LANGHORNE responded approvingly. LANGHORNE suggested that the UCE scale the TATP

Defendant's Initials                    19

recipe to provide the appropriate amounts of explosive required to detonate targets, including a building.

Between June 28 and July 2, 2019, LANGHORNE sent multiple messages to the UCE regarding a nasheed that LANGHORNE wanted to be made. A nasheed is a work of vocal music that carries with it an Islamic belief, practice, etiquette, or lesson. LANGHORNE stated that he wanted "a nasheed that uses the sounds of the battlefield as music. Since that isn't haram [forbidden by Islamic law]." LANGHORNE then stated:

> Firstly I need a handful of sounds and one in particular I have only ever seen once. During the prison break dawlah did there was a man recording. And he gives a loud takbir at the second explosion[.] I want that specific takbir[.] And a few other takbirs that are good as well.

("Dawlah" translates to "dynasty" or "state," and commonly is used to refer to ISIS. The "takbir" is the expression in Arabic "Allahu Akbar," which means "God is great," and is commonly used as a battle cry by Islamic extremists.) LANGHORNE further sent the UCE multiple links to videos on YouTube, including specifying that he wanted to include a clip of "Just the children saying[]kill them all" and a particular recording of a bomb exploding. LANGHORNE then told the UCE "I have the lyrics down" and,

> In short the song is about retaliation. Fatuluhum, or Kill them all[].] The chorus is kill them all, And it repeats five times inbetween the lyrics[.] Amidst gunfire, bombs, recitations and kill counts (done to muslims. We list a country then the amount of muslims killed as a result of US "intervention" or war. . . . I'll explain in further detail a bit

Defendant's Initials [signature]          20

later.  But the premise of the nasheed is to encourage
justified retaliation. Hince. Kill them all

On August 1, 2019, the UCE messaged LANGHORNE and stated that he
needed to travel for an urgent project for Dawlah al Islamiyah, a term
LANGHORNE understood to refer to ISIS.  LANGHORNE responded "Be
careful."

On November 5, 2019, the UCE messaged LANGHORNE to let him know
he was back from "Dawla" and would have the final video completed shortly.  On
November 7, 2019, the UCE sent LANGHORNE three versions of the final video
("TATP Video 4").  TATP Video 4 included what was represented to be a recipe for
TATP; the recipe, however, had been altered so that it would only result in the
creation of an inert product.  TATP Video 4 also included yield multipliers
purporting to be sufficient to destroy specific targets, and it featured demonstrations
of a tree, car, and barn being blown up.  The UCE provided LANGHORNE with
three versions of TATP Video 4 – one without music and two containing existing
nasheeds that LANGHORNE had previously suggested the UCE should use as
background music.  After sending the first version of TATP Video 4 without music,
LANGHORNE responded with praise, noting, "[t]he video appears to be legal, well
scripted, shows proper yield, creation and where to obtain supplies."  After sending
the other two versions of TATP Video 4, LANGHORNE inquired whether the UCE
was familiar with "bitchute," which LANGHORNE described as "a video streaming
platform like youtube" except "it's more wild west out there."  (BitChute is a peer-to-

Defendant's Initials _____                    21

peer video sharing website that is publicly viewable on the World Wide Web.
Instead of using centralized servers, BitChute utilizes a BitTorrent client that runs in
the web browser. As a video shared to BitChute is downloaded by other users, the
other users become hosts for the video, meaning that future users can obtain portions
of the video content from numerous other users. By operating in this way, BitChute
decentralizes the locations at which its content is hosted. BitChute is favored by
extremists because of its permissive environment.) LANGHORNE said that he had
previously uploaded the video Flames of War II to BitChute and that BitChute had
not removed it. (Flames of War II is an ISIS-produced propaganda video in which
ISIS claims responsibility for various terrorist attacks and threatens further attacks
against the United States.)

A confirmation email located in LANGHORNE's Google account showed
that he had uploaded Flames of War II to BitChute on October 1, 2019. On
October 24, 2019, LANGHORNE sent an email to an address associated with
BitChute in which he stated that he was "[h]aving trouble uploading videos, I have a
decent number of videos I'd like to upload and can't seem to continue uploading.
Yes they are ISIS videos, the reasoning for this is that the media i[s] snuffing and
suppressing this information heavily and I feel that journalistic integrity demands
that people have free and open access to the information without being put on a list
for having viewed the videos in question, or being scrutinized for atypical curiosity."

Defendant's Initials _____          22

On November 11, 2019, an FBI Intelligence Analyst located in Jacksonville, Florida, within the Middle District of Florida, observed that LANGHORNE had uploaded to BitChute one of the versions of TATP Video 4 containing a nasheed. LANGHORNE entitled the video "TATP OR: HOW YOU LEARNED TO STOP WORRYING AND LOVE THE BOMB." LANGHORNE included a summary of the video in which he stated that it was "simply to be utilized for recreational and landscaping purposes" and that it would provide "instructions and the yield" needed to "destroy . . . tree stumps, junk yard cars, or perhaps an old moldy barn of some sort." LANGHORNE also posted a comment on the video describing the nasheed as follows: "basically it's about how Islamic leadership is failing and questionable at best in comparison to past leadership." Approximately 28 minutes after uploading the video to BitChute, LANGHORNE posted to his Twitter account, "Its alarming to hear sirens in the distance now." A few hours later, LANGHORNE deleted the video from BitChute.

Later on November 11, 2019, LANGHORNE uploaded the version of TATP Video 4 that did not contain a nasheed, which he entitled "HOW TO MAKE BOMBS/EXPLOSIVE MATERIAL: TATP EDITION." LANGHORNE included a significantly shortened description of the video that did not make reference to blowing up any particular targets.

On November 15, 2019, FBI special agents and other law enforcement officers arrested LANGHORNE at his residence in Roanoke, Virginia. After being arrested,

Defendant's Initials [signature]                    23

LANGHORNE was transported to the Roanoke FBI office for an interview. LANGHORNE was advised of his Miranda rights, and he agreed to speak with two agents without an attorney.  During the interview, LANGHORNE admitted that he had "probably at some point" pledged allegiance to ISIS and Abu Bakr al-Baghdadi, who was the leader of ISIS from 2014 until his death on October 26, 2019. LANGHORNE claimed that he had later broken his allegiance, but he stated it was "very probable" that he had later reaffirmed his vow.  LANGHORNE was shown a printout of his communications with the UCE, and LANGHORNE admitted they were his communications.  LANGHORNE also admitted ownership and control of the social media accounts discussed herein and that he had uploaded TATP Video 4 to BitChute.

LANGHORNE's phone was seized from him at the time of his arrest and agents later searched it  pursuant to a federal search warrant.  Stored on the phone were 287 ISIS or other Islamic extremist propaganda videos as well as the TATP videos that the UCE had sent to LANGHORNE.  The phone also was logged into the account that LANGHORNE had used on the secure messaging platform to communicate with the UCE and contained some of the messages exchanged between them.

Defendant's Initials                     24