UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>-VS- )<br>)<br>ROMEO XAVIER LANGHORNE )<br>)<br>Defendant. )<br>)<br>_____/ | CASE NO.: 3:19-cr-218-HES-LLL |

**SENTENCING MEMORANDUM ON BEHALF
OF THE DEFENDANT, ROMEO LANGHORNE**

  Through the undersigned counsel, the Defendant, **ROMEO LANGHORNE** (hereinafter "Defendant" or "Mr. Langhorne"), files the following Sentencing Memorandum setting forth all factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

**INTRODUCTION**

  On December 5, 2019, a grand jury returned a one-count indictment alleging that Mr. Langhorne violated 18 U.S.C. §2339B(a)(1) by attempting to provide material support to a foreign terrorist organization. On May 13, 2021, Mr. Langhorne appeared before the United States Magistrate Judge James R. Klindt and entered a plea of guilty to the sole count of the indictment. The plea agreement obligates the United States Government to recommend a potential three-level reduction for the Defendant's acceptance of responsibility and assistance in prosecution of his own conduct pursuant to USSG §§ 3E1.1(a) and (b).

  As charged, the sole count of the indictment carries a maximum sentence of twenty (20) years, a fine of not more than $250,000.00, or both imprisonment and a fine, a term of supervised release of any years or life, and a mandatory special assessment of $100.00. As calculated by the United States Probation Office, and as set forth in its Presentence Report (PSR), the guidelines establish a sentencing range of two hundred forty (240) months pursuant to USSG §5G1.1(a) as the base offense level and criminal history category establish a sentence that his higher than the

1

maximum allowable statutory punishment. In calculating the guidelines, the United States Probation Office has included and determined the following:

- Base Offense Level of 26 (USSG §2M5.3(a))
- A 2-level increase for providing support or resources with the "intent, knowledge, or reason to believe that they are to be used to commit or assist in the commission of a violent act" pursuant to USSG §2M5.3(b)(1)(E)
- A 2-level decrease for acceptance of responsibility pursuant to USSG §3E1.1(a)
- A 1-level decrease for assisting in his own prosecution by timely notifying authorities of his intent to enter a plea pursuant to USSG §3E1.1(b)
- A 12-level increase pursuant to the terrorism enhancement (USSG §3A1.4(a))

Mr. Langhorne would submit that in calculating the guidelines the Unites States Probation office has incorrectly applied both the terrorism enhancement pursuant to USSG §3A1.4(a) and the 2-level enhancement pursuant to USSG §2M5.3(b)(1)(E). Specifically, Mr. Langhorne would argue that there is no legal or factual basis for either enhancement and the Government is unable to meet its burden with regard to the terrorism enhancement. Those arguments are discussed in greater detail below.

Despite the Government's best efforts to paint Mr. Langhorne as extremist and potentially violent individual, the Government cannot escape the facts of this case which completely undercut any such notion. The indisputable facts of this case are that United States Government targeted Mr. Langhorne for his provocative comments and discussions on various social media platforms regarding the religion of Islam. Acting in an undercover capacity, they initiated conversations with Mr. Langhorne and incited the production of a video that would inform individuals on how to make an explosive known as "TATP". To make certain that a prosecution of the Defendant would occur, the Government produced the actual video in question, circled back to Mr. Langhorne when the interactions and conversations between them grew cold, and made sure to utilize enough terminology in their text communications to ensure that a later-review of the transcript would support a §2339B charge. The entire interaction appears to have operated as a prosecutorial "check list" - making sure enough boxes were marked off so that an indictment could be obtained.

The reality is that Mr. Langhorne is a young man who often sought contentious or provocative interactions online by using taboo terminology (jihad, ISIS, etc.) and engaging in controversial discussion. While the Government will likely contend that Mr. Langhorne's motivation for these actions was his unwavering support and dedication to helping terrorist groups

2

like ISIS, the truth is much more simple and less threatening. Mr. Langhorne suffers from chronic mental health issues and other disorders including attention deficit disorder, schizophrenia, schizoaffective disorder, bipolar disorder, and potentially Asperger's syndrome. These conditions (which were not being actively treated or addressed during the time of his interactions with the Government) affected every aspect of Mr. Langhorne's life and thinking. Although clearly intelligent, these conditions left him socially awkward and isolated, yet created a longing to feel self-important and accepted. These desires drove Mr. Langhorne's thinking, pushing him to seek affirmation from, and through, his interactions with others. Accordingly, Mr. Langhorne began (behind the anonymity of a keyboard) engaging in controversial topics online, making edgy comments, taking minority or uncommon positions on various taboo issues, attempting to exert superior information and knowledge over others, flaunting legal knowledge, and demonstrating how close to various uncrossable lines he could get.

Unlike the lack of record evidence to support the Government's contention that Mr. Langhorne is an extremist and dangerous, there is ample evidence to support the fact that Mr. Langhorne suffers from mental illness; conditions that help explain his conduct and provide a legal basis for a sentence far below any advisory guidelines. For instance, Mr. Langhorne underwent two separate competency evaluations during the pendency of this case, each finding that although he was competent, several mental health conditions existed and that he could psychologically decompensate without proper and continued treatment (which included several prescription medications to treat mental illness). Additionally, Mr. Langhorne seeks to introduce the forensic testimony of Dr. Steven Bloomfield at sentencing who will confirm the fact that Mr. Langhorne's mental conditions affected his demeanor, thinking, and interactions with others.[1]

## BACKGROUND OF THE DEFENDANT
## AND RELEVANT PROCEDURAL HISTORY

Mr. Howard is a thirty-two-year-old African American male currently incarcerated at the Bradford County Detention Facility, located in Starke, Florida. As outlined in the "Personal and Family Data" section of his PSR, Mr. Langhorne grew up in an unstable, unsupportive, and, for all intents and purposes, dangerous family home. Mr. Langhorne did not have the benefit of a relationship with his father, nor any positive male role model. Suffering from mental health issues

---

[1] For reasons of privacy, Dr. Bloomfield's psychological report will be tendered to the Court under separate cover.

3

early on (depression, etc.) and even received disparate treatment from his mother, who often regarded him as being disabled or handicapped and had him take special education courses in school. Contributing to the difficult relationship between Mr. Langhorne and his mother was the fact that she also likely suffered (suffers) from significant mental health issues as well. Mr. Langhorne felt isolated, disregarded, and in his own words "emasculated" by his mother, who often forced him out of the home in order to exert her dominance and influence over him, leaving him homeless at times. While these ejections from the home exacerbated his mental health conditions, so did life inside of the home. Mr. Langhorne endured emotional and physical abuse from his mother (even once being removed from the home and placed in foster care suffering physical abuse at her hands) as well as psychological trauma after witnessed his mother sustain a nearly fatal gunshot.

      Mr. Langhorne is overweight, socially awkward, and suffers from depression, bipolar disorder, anti-social disorder, oppositional defiance disorder, ADD, schizophrenia and schizoaffective disorder, anti-sand potentially Asperger's Syndrome. He suffered emotional and psychological trauma and physical abuse at the hands of the very people entrusted to protect and meet his needs. Given these circumstances, it is not difficult to understand how easy it was for Mr. Langhorne to immerse himself in an online world where he could act and feel important, remain anonymous, and be anything he wanted. While the acceptance and importance he found online provided a high point, he also found several low points, at times feeling suicidal.

      **This** was the individual that the Government encountered, sought out, and interacted with online. While Mr. Langhorne does not necessarily argue that the Government knew of the extent of his mental health or upbringing, or that they intentionally preyed upon him for such things, it cannot be denied that this is the proverbial fish that their net drug in. These facts are significant as they provide context and explain the "why" behind Mr. Langhorne's conduct; a stark contrast to the reasoning likely to be espoused by the Government at sentencing (that he is violent and extreme and poses a danger to society).

      In February of 2019, a third party began conversing with Mr. Langhorne, attempting to set him up with an undercover agent who was posing as a member of the Muslim community. The initial conversation between Defendant Langhorne and the third-party was strained as Defendant Langhorne was largely nonresponsive as the two discuss the fact that Defendant Langhorne was likely playing video games. Langhorne also mentioned that he was working a lot and often exhausted. As the Government is likely to point out, there are certain terms used during this

conversation which they claim prove that Defendant Langhorne was attempting to converse with, or support, members of ISIS. The actual dialogue, however, tells a rather different story. During the conversation with the third-party, the term "ISIS" is **never** used. In fact, the term "ummah" is used once; a term that is used to describe the entirety of the Muslim world or community of believers, not specifically ISIS. While Langhorne agrees to speak with the recommended individual, Langhorne comments "I get upset but I don't hate any brother who supports dawlah." At no point does he affirm his support for ISIS, or that he wants is seeking to provide such support, but rather comments that he does not "hate" such individuals. Langhorne goes on to state that he is only interested in having "conversations of ideas" and that he is not interested in any "planning", "plots" or anything "illegal."

This initial dialogue with the third party provides a nearly perfect example of Langhorne's mindset and actions and how they are affected by his mental health. Here, he is looking to feel important and respected as others are seeking out his knowledge and information. He is demonstrating knowledge of certain lines that cannot be crossed – noting that the conversations are limited to just discussion and ideas, no action. This is a recurring them, and continues in subsequent conversations with the undercover agent.

Approximately a week later, an undercover agent reaches out to Defendant Langhorne to start a conversation. It is important to note that Langhorne's information was passed onto the undercover agent by the third-party, and that the undercover reached out to Langhorne first. Initially, Langhorne discusses (in response to a statement by the undercover) ideas regarding "pr" or public relations. Langhorne describes having an idea to address three demographics – sisters of the faith, those who are waiting and are unsure about attacks, and media correction or memes. Again, this conversation begins to provide Langhorne with the exact situation he desires – a feeling of importance as others are seeking out his knowledge and ideas. If anything, this type of behavior and dialogue suggest that his actions are there to provide support for his own ego or needs, not support for a terrorist organization.

Throughout the entirety of the conversation, the undercover agent makes repeated attempts to have Langhorne agree to make the video, or to provide additional information – a transparent attempt to have Defendant Langhorne utilize certain words or make certain comments that would aid in prosecution. These attempts are often rebuffed as Langhorne passes the conversation back to the undercover agent for further instruction or clarification. Langhorne reiterates that he at no point wants to do anything illegal or commit any crimes, but rather just a discussion of ideas to

make videos for non-specific groups or affiliations. Langhorne even specifically address that he is only engaging in a conversation of ideas, and not providing any expert advice or anything else that could be construed to support a "2339B charge."

On February 16, and again on February 17, 2019, the undercover agent attempts to initiate a conversation with Langhorne, again insisting that Langhorne discuss making videos and attempting to have Langhorne discuss specific ideas. At that point, Langhorne begins to discuss two videos: one for making fireworks, the other for public relations. The undercover focuses the conversation on the former, ignoring the later. As the undercover continues to press Langhorne, Langhorne comments that the purpose of any video would be for scientific knowledge, and further elaborates that such knowledge could be used by "the people in Yemen who are starving" and could use such a video to "get rid of abandoned buildings so that that the Houthis cant use them in tribal warfare." Here, Langhorne is discussing the idea of passing on knowledge (of explosives) to those vulnerable people who are under attack. At no point does he mention ISIS or a foreign terrorist organization as a target for this information. He does, however, go on to suggest that his ideas are not meant to harm others.

Perhaps the most interesting part of the exchange between the Government and Mr. Langhorne occurs when Langhorne directly accuses the undercover of being a federal agent. This exchange, once again, highlights the type of thinking employed by Langhorne. He knows he is talking to an agent, as it is apparent in the cat-and-mouse type of dialogue that they are engaging in. He calls the undercover agent out but proceeds to engage in the conversation because he believes he knows there the (legal) line is – wanting to walk right up to it. At one point Defendant Langhorne even calls the ATF on a recorded line to inquire about what would be required to legally make explosives/fireworks. Why would he make such a call when he knows he is dealing with a federal agent in a separate dialogue about making videos? The answer is simple, it made him feel important by flaunting the line.

Conversations between the undercover and Defendant Langhorne decrease in frequency and substance over time. The undercover agent eventually produced portions of videos in April, May, and June. In August, the undercover reaches out to Defendant Langhorne advising that the final version of the video is almost finished. Defendant Langhorne is largely nonresponsive to these comments, does not demand any production, and casually comments using words like "ok" and "neat" in response to the undercover's assertions that the video will be finalized soon. At this point in the conversation (August), the undercover states that he will be away working with

6

brothers from the "Dawlah al-Islamiyah" and that he will finish the video when he returns. It is important to note that it was, again, the undercover who used the term "dawlah", and not Defendant Langhorne. It is not until November of 2019 when the undercover agent produces a video for making TATP which is ultimately loaded up to the internet – a video that provides a non-working formula for making an explosive.

These facts are an integral part in understanding exactly what took place between the Government and Mr. Langhorne, and indispensable in fashioning an appropriate sentence. As discussed below, Mr. Langhorne would submit that based on these facts and the law, there exists no basis for the application of any enhancement, and that sufficient mitigation exists to warrant a sentence well below any guidelines ultimately established by this Court.

## 3553 FACTORS AND
## OTHER SENTENCING CONSIDERATIONS

### a. General Comments:

As the Court is aware, 18 U.S.C. §3553(a) holds that a court must impose a sentence that is sufficient, but not greater than necessary to comply with the purposes that are set forth in the statute. Specifically, a sentence needs to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from future crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a) also dictates that a court consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant and the kinds of sentences available.

The guidelines serve as a starting point or initial benchmark for the determination of a just and appropriate sentence – not a rigid or inflexible system of point accumulation that divests a court of its discretion. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). Since a court is required to consider all of the 3553(a) factors to fashion a just sentence, a court cannot simply presume the guideline range to be reasonable. *See United States v. Perez*, 571 F. App'x 495, 497 (7th Cir. 2014).

It would be tempting to look at the nature of the charges (support for a terrorist organization) and begin to view the entire case through a lens that suggests that anyone, under any set of circumstances, who pleads to such an offense is an extremist and dangerous. That type of view point would obviously be at odds with the requirements of 3553(a) as a more detailed review of the individual before the court, and the circumstances of the case is required. As discussed at length above, there are significant mitigating factors and circumstances in this case that warrant a sentence far below any guidelines established by the Court.

For starters, Mr. Langhorne has, is, and will continue to suffer from multiple mental health conditions. As noted in Dr. Bloomfield's report, these conditions provide an explanation as to why someone would go online and engage in the type of conduct and discussions that Mr. Langhorne did. They explain why someone would continue to engage in dialogue with an individual they know most likely to be a federal agent working undercover. In short, they explain the "why" behind his actions – which directly refutes the Governments likely contention that Langhorne engaged in this conduct because he truly loves or supports ISIS. Keeping in mind that Langhorne was not currently under medication for his mental health issues, this entire episode suggests that these were the actions of a cocky and immature young man looking to feel important by playing a game of cat-and-mouse with the government; not the actions of a dangerous individual looking to support terrorism. The Government cannot attempt to speculate about the Defendant's mindset and motivations at sentencing and ignore the mental health issues at the same time. They are part and parcel, and the Court must consider the same when fashioning a sentence. These present mental health issues also form the basis for a consideration by this Court of a variance or departure pursuant to Section 5H1.3 or 5K2.13 of the Guidelines.

Likewise, in considering the circumstances of the offense, it would be improper for the Government to focus solely of the conduct of the Defendant and ignore their own role in the events leading up to Defendant Langhorne's arrest. The Government sought the Defendant out. The Government continued to inquire of the Defendant through repeated contact and questioning. The Government produced the video. It is likely that the conduct in question would not have occurred but for the Government's actions. Langhorne would submit that this Court has every right under 3553(a) to consider these facts when determining an appropriate sentence. In line with the 3553(a) mandate to consider the circumstances of the offense, is the concept of an "imperfect entrapment" as an additional basis for a variance under 3553(a) as the argument directly relates to both the characteristics of the offense particular to Langhorne's culpability and the protection of the public.

Prior to the Supreme Court's decision in *Booker*, courts had used imperfect entrapment as a basis for departing under the mandatory guidelines. *See United States v. Bala*, 236 F.3d 87 (2nd Cir. 2000); *United States v. Giles*, 768 F. Supp. 101, 103-04 (S.D.N.Y. 1991); *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1999); *United States v. McClelland*, 72 F.3d 717, 726 (9th Cir. 1995); *United States v. Taylor*, 696 F.3d 628, 633-34 (6th Cir. 2012); *United States v. Osborne*, 935 F.2d 32, 35 n.3 (4th Cir. 1991); *United States v. Way*, 103 F. App'x 716, 718 (4th Cir. 2004). Such an argument can be raised for sentencing purposes even where a defendant who first proposed an illegal scheme. S*ee United States v. McClelland*, 72 F.3d 717, 725-26 (9th Cir. 1995). Even though such departures are not treated in the same fashion post-booker, they are still relevant to the factors outlined in 3553(a).

As noted in the Pattern Jury Instructions for the 11th Circuit, entrapment occurs when "law-enforcement officers or others under their direction persuade a defendant to commit a crime that the defendant had no previous intent to commit." While the instructions go on to note that it is not entrapment if the government only offers the opportunity to commit the crime, the facts of this case indicate that the government's actions extend a bit further. Note that this argument is raised only in the context of sentencing, and not as an outright defense to the charge. Defendant Langhorne does not deny uploading the video to bitchute. He does not deny providing information or advice on its contents or creation. Those actions, however, cannot be separated from the actual production of the video by the government, and their unsolicited contact with the Defendant from February through November of 2019. Accordingly, it is entirely proper for this Court to consider not only the conduct of the Defendant, but that of the Government as well.

### b. Enhancements

The PSR notes, and the Government will likely seek, the application of the "terrorism enhancement pursuant to Section 3A1.4 of the Sentencing Guidelines. Said enhancement increases a defendant's exposure by twelve (12) levels, and also places the defendant in a level VI criminal history category. This particular enhancement is arguably more punitive than the actual base offense for which Mr. Langhorne has pleaded guilty. Its application is both factually and legally impermissible.

Courts have consistently held that the terrorism enhancement does not automatically apply to all material support offense. For example, in *U.S. v. Alhaggagi*, the Court held that for such an enhancement to apply, the government must prove elements distinct from those of the crime of

conviction, specifically that the offense committed "involved, or was intended to promote, a federal crime of terrorism." *United States v. Alhaggagi*, No. 17-cr-00387-CRB-1, 2019 WL 1102991, 2019 U.S. Dist. LEXIS 37889, at *24 (N.D. Cal. Mar. 8, 2019). This requires examining the specific intent of the defendant with respect to the offense of conviction. The Court further noted that the underlying felony must be calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against governmental conduct. *See also U.S. v. Arcila Ramirez*, 16 F.4th 844 (11th Cir. 2021).

>   As the Alhaggagi Court noted:
>
>   *"The parties agree, consistent with the district court's decision and those of our sister circuits that have addressed the issue, that § 2332b(g)(5)(A) imposes a specific intent requirement. See, e.g., United States v. Hassan, 742 F.3d 104, 148–49 (4th Cir. 2014); United States v. Wright, 747 F.3d 399, 408 (6th Cir. 2014); United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014); United States v. Stewart, 590 F.3d 93, 138 (2d Cir. 2009) ("[C]omission of a federal crime of terrorism . . . incorporates a specific intent requirement.") (quoting Chandia I, 514 F.3d at 376 (cleaned up)). We agree with this interpretation of § 2332b(g)(5) and the reasoning of our sister circuits in adopting it.5 As the Second Circuit explained, § 2332b(g)(5) "does not require proof of a defendant's particular motive," which is "concerned with the rationale for an actor's particular conduct." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010). Rather, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." Id. The appropriate focus thus is not "on the defendant, but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." Id. In other words, 2332b(g)(5) "is better understood as imposing a requirement 'that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Id. (quoting Stewart, 590 F.3d at 138)."*

In *Alhaggagi*, the government attempted to argue that the defendant's opening of social media accounts for people he believed to be ISIS sympathizers because he "knew" he was supporting ISIS and that ISIS was a terrorist organization. In other words, the argument was that every act of support (or attempted support) eventually inures to the benefit of the terrorist organization and its goals. As the Court noted, that logic cannot support the requirement of proving

10

specific intent. If it was meant to be a generic and general standard, then no specific intent would be required. The trial court's decision to apply the enhancement was overturned.

In the instant matter, there is insufficient evidence for the Government to bear its burden at sentencing that Defendant Langhorne's conduct was calculated to influence the conduct of government. It is likely that the Government will attempt to string together portions of various conversations Defendant Langhorne had with multiple individuals to support claim that his conduct was specifically intended or calculated to affect government conduct. In doing so, the Government will attempt to take portions of separate conversations, apply their own meaning and context, and attempt to meet their burden. Such an analysis would attempt to substitute the Government's interpretation of conduct for actual evidence sufficient to establish their burden. The Government cannot ignore the fact that Mr. Langhorne sought an information video only, knew he was dealing with government agents, and that the video produced by the government did not work. In other words, how can a video that does not work be "reasonably calculated" to affect government?

These same factors (fake video) also undercut the applicability of the two-level enhancement pursuant to Section 2M5.3(b)(1)(E) as noted in the PSR. Such an enhancement requires a finding that there was "intent, knowledge, or reason to believe" that the resources being offered were to be sued to commit or assist in the commission of a violent act." Additionally, Mr. Langhorne noted time and time again that the purpose of the video was to educate individuals so that other would think twice about making an attack if they knew their targets had sufficient information to protect themselves. In other words, the record evidence demonstrates that the dissemination of information would <u>prevent</u> a violent act from occurring. Accordingly, such an enhancement would be inapplicable.

### c. Other

Even if this Court were to conclude that the terrorism enhancement applied, its application to this case yields an absurd result that is at complete odds with the factors as outlined in 3553(a). Section 3A1.4 was enacted to combat hardcore terrorism. Unfortunately, any instances where such an enhancement would apply are treated identically for purposes of punishment, with the twelve-level enhancement making no allowances for specific conduct. In other words, the most benign of actions that would qualify for such an enhancement are treated the same as the most severe conduct. Accordingly, some courts have noted that applying the same enhancement to differing conduct of defendants can be a flawed endeavor and have sought a more just and sufficient

sentence by considering the factors as set forth in 3553(a). *See, e.g., United States v. Salin*, 690 R3d 115, 126 (2d Cir. 2012). Additionally, individuals with little to no criminal history (like Langhorne) are catapulted into a level VI range, exposing them to the most severe punishments under the guidelines.

Section 5K2.0 of the Guidelines holds that a court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance of a "kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that…should result in a sentence different rom that described." This section exists for the exact circumstances we find ourselves in with the possible application of the terrorism enhancement; an enhancement that fails to take into account circumstances of a particular defendant's conduct when compared to another – a process that is a common them throughout the guidelines as a basis for departure. Furthermore, Section 3E1.1 of the guidelines notes, in reference to a defendant's acceptance of responsibility, that the reduction of an offense level recognizes "legitimate societal interests." The application of the terrorism enhancement creates a situation where the statutory maximum penalty forms the new guideline range, thus eliminating any and all benefit of Defendant Langhorne's acceptance of responsibility. In other words, the enhancement renders the Defendant's acceptance of responsibility moot, creating a scenario where the relief contemplated by the guidelines as a societal benefit is given absolutely no weight.

## SENTENCING RECOMMENDATION AND CONCLUSION

Mr. Langhorne is keenly aware of the seriousness of the seriousness of the charges to which he has plead, as demonstrated by his willingness to enter a plea and face a possible enhancement that exposes him to the statutory maximum sentence for his charge. To fashion an appropriate sentence however, this Court must take into account all the facts and circumstances, even those which would undercut the Government's attempt to paint Mr. Langhorne with the same terrorism brush as perhaps other defendants. Mr. Langhorne's case is different. It is marked by mental health concerns, government overreach, and a sentencing guideline structure that may lead to an unjust result. Mr. Langhorne needs ongoing medical treatment for his mental health, not prolonged incarceration. He has been in a county detention facility since 2019 and has continued to suffer from ongoing mental health problems. When considering the fact that he was not under medication or a doctor's care when the events at issue took place, a sentence that allows for

treatment over incarceration to address the underlying issue seems more pragmatic and in line with the directives of 3553(a). Mr. Langhorne is remorseful for his actions, and only seeks a sentence that is sufficient, but not greater than necessary to comply with the statutory goals outlined in 18 U.S.C. §3553(a). A recommendation for a specific sentence will be made during Mr. Langhorne's upcoming sentencing hearing.

Respectfully submitted, this 27th day of June 2022.

**ARNOLD LAW FIRM**

BY: */s/John P. Leombruno*
John P. Leombruno, Esq.
Fl. Bar # 0851361
Attorney for Defendant
6279 Dupont Station Ct.
Jacksonville, FL 32217
(904) 731-3800 (main)
(904) 731-3807 (facsimile)
jleombruno@arnoldlawfirmllc.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 27, 2022 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: AUSA Laura Taylor, Esq.

BY: */s/ John P. Leombruno*
John P. Leombruno, Esq.
Fl. Bar # 0851361
Attorney for Defendant